**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**DONNA ZENADOCCHIO,**

               **Plaintiff,**

**Case No. 3:12-cv-99**

**-v-**

**Judge Thomas M. Rose**

**BAE SYSTEMS UNFUNDED WELFARE**
**BENEFIT PLAN, et al.,**

               **Defendants.**

_____

**ENTRY AND ORDER GRANTING IN PART ZENADOCCHIO'S**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**
**(Doc. #16); OVERRULING BAE SYSTEMS AND HARTFORD'S**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**
**(Doc. #12) AND REMANDING THE CASE FOR A FULL AND FAIR**
**EVALUATION**

_____

This cause arises from the disability of Plaintiff Donna Zenadocchio ("Zenadocchio").

Before becoming disabled, Zenadocchio was employed by BAE Systems North America as a

financial analyst and was covered under the Defendant BAE Systems Unfunded Welfare Benefit

Plan ("BAE"). In the course of her employment, Zenadocchio was provided 26 weeks of short-

term disability ("STD") benefits for an inability to perform her "Own Occupation" pursuant to

Group Insurance Policy Number GLT-674180 ("Policy"). The Policy is administered by

Defendant, Hartford Life and Accident Insurance Company ("Hartford"). Hartford also issued to

BAE a Group Benefit Plan ("Plan"), which contains the provisions applicable to the Policy. At

the expiration of Zenadocchio STD benefits, Hartford initially approved Zenadocchio for long-

term disability ("LTD") benefits, but later terminated LTD benefits arguing that Zenadocchio

was no longer considered 'disabled' under the Plan.

Zenadocchio has brought a claim for benefits under the Plan pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), arguing she is entitled to LTD benefits and that BAE and Hartford wrongfully denied her those LTD benefits.  This case only embraces Hartford's denial of Zenadocchio's claim for LTD benefits under the "Own Occupation" period of disability, spanning from May 7, 2011 to April 4, 2012.

The Sixth Circuit has directed that claims regarding the denial of ERISA benefits are to be resolved using motions for judgment on the administrative record. *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). The court is to conduct its review "based solely upon the administrative record," and evidence outside the administrative record may be considered "only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id.*

Now before the Court are Motions for Judgment on the Administrative Record submitted by Plaintiff and by Defendants. Docs. #12 and 16. The Administrative Record ("AR") of this matter has been filed and the parties have filed responses. Docs. #19 and 20. The AR consists of 667 numbered pages which will be cited as "AR (page number)."

A factual background taken from the AR will first be set forth.  The factual background will be followed by the standard of review for claims to recover benefits due under terms of a plan subject to ERISA, concluding with an analysis of the Motions for Judgment on the Administrative Record.

## I.     FACTUAL BACKGROUND

### A.  The Financial Analyst Position

- 2 -

Zenadocchio worked as a Financial Analyst for BAE, providing support in the execution of government defense contracts. AR 373, 605. The record contains two assessments of the Financial Analyst Position at BAE. The first assessment is a "Job Position Information" form completed on April 30, 2010 by Peter Jones, a manager at BAE systems. AR 316-317. This assessment describes that the primary purpose of the position is to "[p]rovide financial analysis for the government in support of the development, manufacture, and fielding of the T-SA Training Aircraft for the USAF and US Navy." AR 316. This assessment indicates that the essential duties of the position are to "[r]econcile financial accounts with government and industry counterparts in the execution of high dollar defense contracts [and to] [r]esearch discrepancies in all aspects of financial accountability; balance government checkbooks for multiple contracts." AR 316. Finally, this assessment describes the physical components of the Financial Analyst Position, which requires sitting 6 hours/day, walking 1 hour/day, constantly fingering, frequently handling, occasionally lifting/carrying up to 20 pounds, occasionally pushing/pulling up to 10 pounds, and occasionally stooping, kneeling, feeling, bending, reaching above shoulders, reaching at waist, and reaching below waist. AR 316-317.

The second assessment was completed in February of 2010 when Hartford referred Zenadocchio's file for an Occupational Analysis Report. AR 193-194, 596-602. The report was completed for the purpose of:

> [C]omparing the essential duties and corresponding physical demands, environmental conditions, and non-exertional requirements of EE's Own Occupation with the Employer of Financial Analyst III with BAE Systems North America to the EE's Own Occupation in the National Economy of Budget Accountant . . . as defined in the Dictionary of Occupational Titles, 1991 edition.

AR 596.

Between the two positions, the Occupational Analysis Report concluded that "[t]he essential duties, environmental conditions, and non-exertional requirements are equal; unable to compare physical demands of Own Occ/NE (Sedentary) and Own Occ/ER." AR 596.  The 'Essential Duties' were described as "applying principals of accounting to analyze past and present operations and estimates future revenues and expenditures to prepare budget . . .." AR 596.  The 'Environmental Conditions' were described as "working in a moderately noisy work environment." AR 596.  Finally, the 'Non-extertional Requirements' were described as "attaining precise set limits, tolerances, and standards; dealing with people; making judgments decisions; coordinating; speaking-signaling; and operating-controlling." AR 596.  The 'Physical Demands' could not be compared; although the parties do not dispute that the Financial Analyst Position was sedentary. AR 596.

In sum, these documents establish that physically, the Financial Analyst Position is sedentary in nature and does not have a significant amount of physical demands outside of the capability to walk, sit, stand, etc.  Cognitively, the Financial Analyst Position is more demanding as indicated by the complex essential duties of the job listed in all of the position assessments contained in the record.

**B.  Relevant Plan Provisions**

The Group Benefit Plan ("Plan") issued by Hartford contains the pertinent provisions applicable to Zenadocchio's LTD benefits coverage under Group Insurance Policy Number GLT-674180 for which Zenadocchio became eligible as a result of her employment with BAE. AR 1-105.

Initially, Zenadocchio was eligible for and received 26 weeks of STD benefits for an inability to perform her "Own Occupation." AR 7.  At the expiration of 26 weeks, if

- 4 -

Zenadocchio continued to be disabled, LTD benefits became available, payable for a period 24 months under the "Own Occupation" standard. AR 105.  Within the "Own Occupation" period, Zenadocchio would be eligible for 66 2/3% of her pre-disability earnings, reduced by any "Other Income Benefits," specifically relevant, any Social Security disability benefits. AR 105, 20-21. The Plan also provides that benefit payments within this period will terminate on the first to occur of: "1. the date You are no longer Disabled as defined; 2. the date You fail to furnish Proof of Loss, when requested by us . . . ." AR 10.

Beyond the 24 months of LTD benefits, the standard shifts to "Any Occupation," meaning that in order to continue receiving LTD benefits under the plan, Zenadocchio "must be so prevented from performing one or more the Essential Duties of Any Occupation."[1] AR 105.

In addition, the Plan contains the following pertinent definitions:

"Disability" is defined at AR 105, which provides:

> **Disability or Disabled** means that during the Elimination Period and for the next 24 months you are prevented by:
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-Disability Earnings.

"Essential Duty" is defined at AR 20, which provides:

> **Essential Duty** means a duty that:
> 1) is substantial, not incidental;
> 2) is fundamental or inherent to the occupation; and
> 3) cannot be reasonably omitted or changed.

---

[1] Again, it is undisputed that this case only embraces Hartford's denial of Zenadocchio's claim for LTD benefits under the "Own Occupation" period of disability, spanning from May 6, 2011 to April 4, 2012.

> To be at work for the number of hours in your regularly scheduled workweek is also an Essential Duty.

"Your Occupation" is defined at AR 22, which provides:

> **Your Occupation**, if used in this Booklet-certificate, means your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location.

Finally, the Plan contains information pertinent to ERISA, stating that the plan is subject to certain ERISA requirements and also providing that "[t]he Plan has granted the Insurance Company [Hartford] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." AR 74. The Plan goes on to describe the rights that all Plan participants are entitled to under ERISA, including "Claims Procedures" and more specifically, procedures for claim denials and appeals. AR 76-77. In this regard, the Plan states:

> Any adverse benefit determination will be in writing and include: 1) specific reasons for the decisions, 2) specific references to the Policy provisions on which the decision is based, 3) a description of any additional material necessary for you to perfect the claim and an explanation of why such material or information is necessary, 4) a description of the review procedures and time limits applicable to such procedures, 5) a statement that you have the right to bring a civil action under section 502(a) of ERISA after you appeal your decision and after you receive a written denial on appeal, and (6) . . . (B) if denial is based on medical judgment, either (i) an explanation of the scientific or clinical judgment for the determination, applying the terms of the Policy to your medical circumstances, or (ii) a statement that such explanation will be provided to you free of charge upon request.

AR 77.

### C. Zenadocchio's Medical History During the Period Hartford Paid Benefits

The onset of Zenadocchio's injury relevant to this dispute began in March 2008 while Zenadocchio was carrying luggage, causing Zenadocchio pain in her legs, hand, shoulders, and knees, ultimately leading to a diagnosis of left leg radiculopathy. AR 289. As the pain worsened

and spread, Zenadocchio ceased working at BAE as a financial analyst on October 13, 2009. AR 605.

In response, Hartford paid STD benefits to Zenadocchio from October 14, 2009 to April 13, 2010 and paid LTD benefits to Zenadocchio from April 14, 2010 to May 6, 2011. A summary of Zenadocchio's medical history during this time period follows.

On October 15, 2009, Zenadocchio saw her primary care physician, Dr. Catherine Sargent, due to extreme pain in her lower back, neck, and shoulder blades, causing Zenadocchio difficulty with walking and stiffness. AR 570. Dr. Sargent initiated lab work that came back normal except for elevated antinuclear antibodies. AR 574. Thereafter, Dr. Sargent referred Zenadocchio to a rheumatologist.

On November 5, 2009, Zenadocchio saw Dr. Shobia Wani, a rheumatologist, whose physical examination attested to Zenadocchio's back as "diffusely tense and tender" and other tender points. AR 556. Dr. Wani's assessment included a recommendation for ANA profile, a possibility of Sjogren's syndrome due to a family history of rheumatoid arthritis, a possibility of fibromyalgia due to "significant myalgia, arthralgia, fatigue, and tender points," and a discussion of treatment options pursuant to Zenadocchio's pain. AR 557.

Throughout 2009, 2010, and 2011, Zenadocchio frequently saw her pain interventionist, Dr. Jeffrey Rogers. At the referral of Dr. Rogers, Zenadocchio underwent an MRI of her spine on December 1, 2009, which revealed "a [s]hallow disc displacement and a superimposed left foraminal annual tears . . . at the L4-5 level." AR 382.

On November 3, 2009, Dr. Rogers completed a BAE Systems Medical Certification in which Dr. Rogers indicated: Zenadocchio was an ongoing patient since 2008; Zenadocchio's condition was serious with a probable duration of one year; Zenadocchio was experiencing

increasing pain in the SI joint, hands, and knees; and Zenadocchio was estimated to return to work on November 9, 2009. AR 623-626.

On December 4, 2009, Dr. Rogers completed an Attending Physicians Statement for Hartford. AR 616. In this first statement, Dr. Rogers indicated a diagnosis of lumbar intervertebral disc disease and spondylosis, citing to radiating pain in the left groin and tenderness in the lumbar spine bilaterally, and estimated Zenadocchio's return to work date as January 4, 2010. AR 616. On December 15, 2009, Dr. Rogers completed another Attending Physicians Statement for Hartford in which Dr. Rogers indicated a diagnosis of disc displacement and annular tear based on the MRI of Zenadocchio's spine. AR 611-614. Also, Dr. Rogers administered bilateral sacroiliac joint injections on October 20, 2009, November 10, 2009, and December 8, 2009. AR 613, 384-386. On January 12, 2010, Dr. Rogers completed another statement in which he indicated that the injections did not provide relief to Zenadocchio's arm, elbow, leg, and back pain; and estimated a new return to work date of February 22, 2010. AR 609. The remaining medical records from Dr. Rogers are discussed below as they were submitted after Hartford's decision to terminate LTD benefits.

On October 21, 2010, Zenadocchio began seeing Dr. Judith A. O'Connell at Pain Alternatives, Inc. to discuss pain management options for Zenadocchio, whose chief complaints included chronic pain and soreness relating to her fibromyalgia that is interfering with running, sleep, sitting, standing, walking, and lifting. AR 484. Dr. O'Connell noted that Zenadocchio has shown no improvement from previous treatment of "chiropractic manipulation, physical therapy modalities, steroid injections, pain medications, over the counter medications, and NSAID." AR 484. Zenadocchio also reported fatigue and depressive symptoms, but denied anxiety or other psychiatric problems. AR 485, 487. Dr. O'Connell's neurological examination stated: "[n]ormal

concentration and attention span noted" and "[e]stimate of mood and affect show no evidence of depression, excessive anxiety, or agitation." AR 488. Dr. O'Connell's musculoskeletal examination described mild to moderate stiffness, soreness, and tenderness throughout Zenadocchio's body. AR 488. Dr. O'Connell concluded that Zenadocchio's "problem was complicated" and "[p]atients overall condition is currently experiencing a flare-up." AR 488.

Zenadocchio attended follow-up visits with Dr. O'Connell again on October 28, 2010, November, 10, 2010, November 16, 2010, December 20, 2010, January 5, 2011, and January 19, 2011; all of which reported generally the same complaints from Zenadocchio and conclusions from Dr. O'Connell's neurological and musculoskeletal examinations. AR 490-512.

On March 17, 2010, Zenadocchio began seeing a new rheumatologist, Dr. Michael W. Stevens. AR 411. Zenadocchio again reported pain and stiffness all over that worsens with exercise and causes Zenadocchio to sleep poorly. AR 411. Dr. Steven's impressions indicated "probable fibromyalgia" and stopped Zenadocchio's hormone replacement therapy and provided Vitamin D therapy. AR 411. Zenadocchio attended several follow-up visits with Dr. Stevens during which time Zenadocchio experimented with different medication options and continued to report global pain, stiffness, and muscle spasms at varying levels of severity. AR 412-413.

On September 4, 2010, Dr. Stevens completed an Attending Physician's Statements of Continued Disability for Hartford in which Dr. Stevens noted a primary diagnosis of back pain and a secondary diagnosis of fibromyalgia and muscle spasms. AR 418. On this form, Dr. Stevens assessed Zenadocchio's functional capabilities, recommending several restrictions on Zenadocchio's physical capabilities, but also stating Zenadocchio did not have a psychiatric/cognitive impairment at that time. AR 419.

On January 6, 2011, Zenadocchio began seeing her current rheumatologist, Dr. Sanford

Wolfe. AR 446.  The records from the visit on January 6, 2011 were initially sent to Hartford on

January 19, 2011 in response to Zenadocchio's correspondence with Hartford regarding any new

physicians she was seeing. AR 438.  Dr. Wolfe's notes from this visit, although often difficult to

read, indicated Zenadocchio's chief complaint as "Fibromyalgia – 09 diagnosed by Dr. Wani

would like better treatment." AR 447.  Dr. Wolfe's physical exam indicated Fibromyalgia tender

points at all examined points. AR 448. The remaining information involving Dr. Wolfe is

discussed below in accordance with Dr. Wolfe's role after Hartford terminated Zenadocchio's

LTD benefits.

Finally, on December 27, 2010, Zenadocchio saw Dr. Janis A. Roberts, a cardiologist,

due to a sudden onset of chest pain and shortness of breath. AR 474-475.  Dr. Roberts'

impressions included inappropriate sinus tachycardia, chest discomfort, osteoarthritis of the back

and hands with associated bulging disks and chronic pain, fibromyalgia, and depression related

to fibromyalgia and chronic back pain. AR 474.  Dr. Roberts recommended that Zenadocchio

remain as active as possible as well as other dietary recommendations. AR 474-475.

Hartford paid STD benefits until they were exhausted on April 13, 2010. AR 247.  In

February of 2010, Zenadocchio submitted a claim to Hartford for LTD benefits because her STD

benefits were nearing the expiration of 26 weeks. AR 7, 245.

In a letter dated April 16, 2010, Hartford wrote to Zenadocchio informing her that her

claim for LTD benefits had been approved effective April 14, 2010. AR 241-242.  The letter did

not indicate the basis of Hartford's decision to approve Zenadocchio's claim for benefits, but di

inform Zenadocchio that these benefits would only last until April 4, 2012, at which point

Zenadocchio would have to meet the "Any Occupation" definition of disability to continue

receiving benefits. AR 242. Hartford paid LTD benefits to Zenadocchio until May 6, 2011. AR 223.

Zenadocchio's current claim for LTD benefits seeks a monthly payout amount of $1,765.81 for the remainder of the 24 month "Own Occupation" disability period: May 6, 2011 to April 4, 2012. This amount stems from Zenadocchio's pre-disability earnings as a Financial Analyst as $4,870.67, 66 2/3% of which equals $3,247.11, reduced by her Social Security disability benefits as required by the Plan. AR 20-21.

**D. Hartford's Decision to Terminate Zenadocchio's LTD Benefits**

After approving Zenadocchio's claim for LTD benefits in April of 2010, Hartford continued to monitor Zenadocchio's condition. Specifically, Hartford's Summary Detail Report for Zenadocchio indicates that, beginning in late April of 2010, Hartford began making a series of information requests, including: a clarification of Dr. Rogers' position on Zenadocchio's abilities, a physical demand from BAE to clarify the job requirements for Zenadocchio's position, and requests to Dr. Rogers for Zenadocchio's updated medical records. AR 163-188.

On August 17, 2010, Hartford conducted a 'Milestone Call' with Zenadocchio, during which Zenadocchio discussed with Nancy Thurmond, the claim examiner: her visits with her rheumatologist, Dr. Stephens; her upcoming appointment with Dr. Rogers; her current functionality as "some days are better than others" with "about 3 good days a week;" and the status of her Social Security Income, that she had not applied but was instructed by the claim examiner to do so and provide proof of filing. AR 177. On August 27, 2010, Zenadocchio contacted Thurmond to inform and provide her with proof of her filing for SSD benefits on the previous day. AR 175.

Also on August 27, 2010, Hartford initiated a proactive investigation of Zenadocchio's file because, according to Hartford, "[a] review of the file identified inconsistencies between the restrictions provided by the claimant's physician and the claimant's self-reported limitations. For example, the restrictions provided on the Attending Physician's Statement received on 02/24/10 provides possible sedentary to light function; however, the claimant states that she cannot return to work." AR 633.  The investigation included some internet searches to get information on Zenadocchio and a number of surveillance attempts to observe Zenadocchio, but the investigation was closed on December 14, 2010 reporting finding "no additional evidence warranting a continued review at this time." AR 106-144, 171.  Hartford later stated in its Summary Detail Report for Zenadocchio that the investigation materials "were not used for claim adjudication as the subject was not identified." AR 151.

Hartford continued to request and review updated medical information from Zenadocchio's physicians; specifically, Hartford contacted Dr. Rogers and Dr. Wolfe in March 2011, requesting each to complete a 'Physical Capacities Evaluation Form' on Zenadocchio's current functionality. AR 162.  In addition to filling out the Form, the letter requested Dr. Wolfe to "provide objective medical findings to support your opinion" if he believed that Zenadocchio would *not* be able to function in the work place at a sedentary level full time. AR 341.

On March 1, 2011, Dr. Wolfe checked 'No' to regards to whether he believed Zenadocchio could work full time and also submitted a completed form, stating that Zenadocchio is able to sit 6 hours/day, stand 2 hours/day, and walk 2 hours/day; in addition to other physical capabilities and limitations. AR 341, 345-346.  Hartford noted in its Summary Detail Report: "based on this response MD hasn't provided medical supporting functional limitations." AR 161. On March 15, 2011, Dr. Rogers responded, stating he was unable to complete the form, based on

- 12 -

which Hartford noted that "functional limitations has not been established and no Dr willing to provide current r/l's." AR 161.

In March of 2011, Hartford sent Zenadocchio's file to Medical Consultants Network ("MCN") to obtain a Peer Review Report and get further clarification of Zenadocchio's functionality. AR 160.

The Peer Review was conducted by Dr. Marwah, a rheumatologist, who provided a report to Hartford based on a review of the following evidence: Zenadocchio's claim file; a conversation with Dr. Roberts (the cardiologist), who opined that Zenadocchio's cardiac condition would not affect her work ability; and an attempted conversation with Dr. Wolfe (who refused to speak with Dr. Marwah until he received a waiver from Zenadocchio). AR 354.  Dr. Marwah's report concluded that: Zenadocchio has fibromyalgia "based on aches and pains, easy fatigability, [and] disturbed sleep;" Zenadocchio "has a component of anxiety and depression;" and a recommendation that Zenadocchio "should be able to engage in duty on a full time basis." AR 354-355.  This recommendation was subject to physical work restrictions, but was otherwise based on Dr. Marwah's conclusion that "[t]he records do not indicate any problems with cognition, concentration, judgment, memory, or insight." AR 354-355, 157.

On April 4, 2011, Hartford sent a letter to Dr. Wolfe asking him to "review the summary and provide any comments and/or remarks in the space provided below." AR 349-350.  Dr. Wolfe responded that he disagreed with Dr. Marwah's recommendation. AR 339, 350.  Dr. Wolfe's reasoning is difficult to read; Zenadocchio's counsel recited Dr. Wolfe's statement to read "Dr. Marwah did not do a full and fair evaluation;" while Hartford recited Dr. Wolfe's statement to read "Dr. Marwah did not do a face to face evaluation."[2] Doc. #16 at 3, Doc. #12 at

_____

[2] The Court recognizes the difficulty in reading Dr. Wolfe's handwriting.  However, based on a review of the document and Zenadocchio's later recitation of Dr. Wolfe's statement to read "Dr. Marwah did not do a face to face

- 13 -

7. Based on Dr. Wolfe's response, Hartford determined that no new medical information was provided to change the direction of the Peer Review Report. AR 154.

On May 9, 2011, Hartford sent a letter to Zenadocchio, informing her that her claim for LTD benefits was being terminated because she no longer met the policy definition of 'disabled.' AR 223. As the basis for this conclusion, Hartford cited to pertinent policy provisions and the following:

• The Application for Long Term Disability Benefits signed on 02/17/10
• The Attending Physician's Statement signed by Dr. Stevens received on 09/14/10
• The Attending Physician's Statement from Dr. Rogers received on 02/24/2010 and Physical Capacities Evaluation received 03/14/11;
• Medical record from Dr. Rogers from 04/14/2009 through 06/02/2010;
• Medical record from Dr. Townley from 06/04/2010 through 06/16/2010;
• Medical record from Dr. Roberts from 04/07/2010 through 01/11/2011;
• Medical record from Dr. Stevens from 03/17/2010 through 07/21/2010;
• Medical record from Dr. Wolfe from 09/15/2010 through 01/06/2011;
• Physical Capacities Evaluation by Dr. Wolfe dated 03/01/2011;
• Job Description for the position of Financial Analyst from your Employer, received on 05/04/10;
• Occupational Analysis for the position of Financial Analyst completed on 02/04/2010;
• Peer medical review performed by Rheumatologist, Dr. Rajendra Marwah on 04/01/2011;
• Conversations between Dr. Marwah and Dr. Roberts; and between Dr. Marwah and Dr. Wolfe; and
• Correspondence from Dr. Wolfe received 05/03/2011

AR 224-225.

The letter went on, stating "[w]e have concluded from the combination of all the medical information in your file that you are able to perform frequent fingering and occasional lifting up to ten pounds and thus perform Sedentary work," and upon comparison of such information to the "Essential Duties of Your Occupation as a Financial Analyst," "we have concluded that you are able to perform these duties as of 05/07/2011." AR 226. The denial letter made no reference

---

evaluation" in her Reply Brief, the Court concludes Dr. Wolfe's statement to read "face to face," not "full and fair." (Doc. #20)

to any analysis of Zenadocchio's mental functionality relating to the essential duties of her position.[3] AR 224-226.  Hartford ceased paying benefits as of May 7, 2011. AR 227.

### E.  Zenadocchio's Appeal of Hartford's Decision to Terminate LTD Benefits

Upon learning of the termination of her claim, Zenadocchio, through her counsel, requested a copy of Hartford's file on Zenadocchio and submitted an appeal containing supporting exhibits to Hartford. AR 286-322.  A summary of the exhibits submitted with Zenadocchio's appeal follows.

Exhibit A of the appeal was a September 7, 2011 fax to Hartford wherein Zenadocchio's counsel challenged the completeness of the administrative record Hartford initially sent to Zenadocchio and requested Hartford to send any information not previously provided. AR 294.

Exhibit B of the appeal contained updated Medical Records of Dr. Wolfe, spanning from January 6, 2011 to October 18, 2011. AR 295-311.  In sum, Dr. Wolfe's records, although not legible in their entirety, discussed Zenadocchio's continuing pain due to fibromyalgia and medication options and strategies relating thereto. AR 296-311.

Exhibit C of the appeal was a Questionnaire completed by Dr. Wolfe, dated September 23, 2011, upon request from Zenadocchio's counsel. AR 312-317. In this questionnaire, Dr. Wolfe indicated 'fibromyalgia' as Zenadocchio's formal diagnosis. AR 312.  Dr. Wolfe also listed "[t]he symptoms commonly associated with Fibromyalgia" as: diffuse myalgias, stiffness, numbing, fatigue, and "'fibro fog' ie decreased concentration combined with severe fatigue."[4] AR 312.  In response to which of those symptoms are "specifically associated with Mrs. Zenadocchio's case," Dr. Wolfe responded "same as above." AR 312.  In describing the "nature,

---

[3] Hartford does not seem to dispute that its initial decision to terminate Zenadocchio's LTD benefits rested on Zenadocchio's physical capabilities in comparison to the physical demands of the job.  Hartford's depiction of the denial later states that Hartford "advised Zenadocchio that because her *physical abilities* were consistent with the "Essential Duties of Your Occupation as a Financial Analyst," Hartford had concluded that she was able to perform those duties . . ." (emphasis added) Doc. #12 at 7-8.

[4] Dr. Wolfe lists one additional symptom that the Court is unable to read.

frequency and location of symptoms that Donna is experiencing," Dr. Wolfe stated "daily symptoms varying in intensity, but often worsened . . . [the remainder of which is illegible]." Dr. Wolfe stated that Zenadocchio's symptoms will last more than 12 months, and described her overall prognosis with regard to her Fibromyalgia as "fair, because uncertainty of response of medication and failure of a number of meds." AR 313.

The Questionnaire also contained a copy of Zenadocchio's job description (the one completed by BAE Manager, Peter Jones) and asked Dr. Wolfe to review it and respond to a series of questions relating thereto. AR 313-317. In response to the question "Can Mrs. Zenadocchio perform this job on a full time basis?" Dr. Wolfe checked 'No' and explained that "numbing, fatigue, and fibro fog are probably the most important factors involved here." AR 313. Dr. Wolfe also stated, only commenting since January 6, 2011 when he began seeing Zenadocchio, that he "does not believe she has or had the ability to perform a job full time." AR 313. Dr. Wolfe went on to describe Zenadocchio's fibromyalgia as severe "at this time," and stated that "currently," Zenadocchio's pain or other symptoms constantly interfere with her attention and concentration. AR 314. Dr. Wolfe then rated Zenadocchio's physical capabilities, stating that in a total eight-hour work day, Zenadocchio could sit for 6+ hours and stand or walk for less than 2 hours. AR 314. Finally, Dr. Wolfe was asked whether he would hire Zenadocchio in his office as a medical records clerk, billing clerk, or receptionist, to which Dr. Wolfe checked 'No,' because "billing and posting require only sitting but intense and prolonged concentration to avoid mistakes . . . a receptionist is often returning phone calls and giving [patients] instructions per my medical direction which also requires intense concentration to avoid mistake." AR 315.

Exhibit D of the Appeal was a video statement of Zenadocchio and her husband. AR 321. Exhibit E of the Appeal was a vocational opinion report completed on November 22, 2011 by

Mark Pinti, a Rehabilitation Consultant/Vocational Specialist, upon the request from

Zenadocchio's counsel. AR 318-320.  In this report, Pinti reviewed the following to "render an

opinion concerning Ms. Zenadocchio's potential to return to work based upon the restrictions

imposed by Sanford Wolfe, MD:"

1. A videotaped interview of Donna Zenadocchio
2. Residual Functional Capacity statement from Sanford Wolfe MD concerning Donna Zenadocchio
3. Job Position Information of Journeyman Financial Manger provided by the Hartford Life and Accident Insurance Company
4. Letter from Jill Nishiyama, MD to Cathy Sargent, DO, dated June 14, 2011

AR. 318.

Based on that evidence as well as Zenadocchio's age, education, and work history, Pinti

opined that physically, "Ms. Zenadocchio is not capable of sustained remunerative work activity

at any level of exertion." AR 319. Pinti went on to discuss that physical restrictions aside, he

agreed with Dr. Wolfe's opinion that "she would be unable to maintain attention and

concentration for any sustained period of time" particularly due to the amount of skill required as

a Financial Manager. AR 319-320.

Finally, in a letter dated November 22, 2011, Zenadocchio, through her counsel,

supplemented her appeal by attaching updated medical records from Dr. Rogers, spanning from

July 28, 2010 to August 31, 2011. AR 271-285.  Among these records was a 'Progress Note'

from a routine follow-up visit dated August 31, 2011, wherein Dr. Rogers noted that

Zenadocchio's pain has worsened since her last visit with a severity of 7/10 on average and that

pain is improved by heat and ice, but aggravated by activity. AR 273.  In this visit, Zenadocchio

reported fatigue, abnormal bruising, pain, insomnia, depression, and panic attacks. AR 273.  Dr.

Rogers' physical examination described Zenadocchio as alert and oriented with tender points on

her sacroiliac joints and bilateral paravertebral muscle spasms. AR 274.  Dr. Rogers' assessment

on this visit indicated unspecified myalgia and myositis, sacroilitis, and depressive disorder. AR 274. Also among the records were notes from Zenadocchio's visits on July 28, 2010, September 29, 2010, December 1, 2010, January 26, 2011, March 9, 2011, and June 1, 2011; wherein Dr. Rogers acknowledged Zenadocchio's continuing pain due to her fibromyalgia and sacrolititis and the medication strategies relating thereto. AR 283-285. Additionally, at the March 2011 visit, Zenadocchio reported difficulty with sleeping. AR 283. At the June 2011 visit, Zenadocchio again reported difficulty with sleeping and reported that: she recently began taking Zoloft, she was taking Lisinopril for hypertension, she was having difficulty coping with her family problems, and her mind was racing at night. AR 283. Dr. Rogers also noted that "[s]he is pretty anxious while she is here." AR 283.

Finally, Dr. Rogers' records contained a consultative examination conducted by clinical psychologist Dr. Donald J. Kramer on November 15, 2010, upon request from the Bureau of Disability Determination for purposes of Zenadocchio's Social Security disability benefits. AR 276-282. During the evaluation, Zenadocchio reported "that her only work limitations are physical in nature," citing to her chronic pain. AR 277. Zenadocchio also reported "some depression secondary to her pain and physical losses and limitations," but that "she [did] not believe that her depression would have any impact upon her ability to work." AR 277. Based on the standard for determining an individual's "Global Assessment of Functioning," Dr. Kramer concluded with a discussion of the four work-related mental abilities, stating that: (1) Zenadocchio's mental ability to relate to others is not impaired; (2) Zenadocchio's "mental ability to understand, remember and follow instructions is not impaired based on her performance in today's examination" although "[s]he does report some cognitive problems secondary to her chronic pain, but no significant cognitive impairment was evident in the

examination itself;" (3) Zenadocchio's "mental ability to maintain attention, concentration, persistence, and pace to perform simple and repetitive tasks may be mildly impaired by her depression, motivational problems, and some reported cognitive problems;" and (4) Zenadocchio's "mental ability to withstand the stress and pressures associated with day-to-day work activities may be mildly impaired by her depression" as Zenadocchio reported "some motivational problems, sadness, some tearfulness, and some problem with frustration tolerance at times," but that overall "her coping skills do appear it be adequate" and she "has the mental ability to perform simple and repetitive tasks." AR 282.

### F. Hartford's Decision to Uphold the Termination of Zenadocchio's Benefits

In response to Zenadocchio's appeal, Hartford solicited the services of Reliable Review Services ("RRS"), a medical consultant vendor, to conduct another Peer Review of Zenadocchio's file. AR 266-267. The Medical Consultant Referral Form instructed RRS to "review the medical information and contact the Physician to discuss the claimant's medical situation and functionality. Then provide your opinion of her work capacity as of 05/07/2011, including any specific restrictions and limitations." AR 267. The record contains two Advisory Reports from RRS; the first of which was faxed to Hartford on December 28, 2011. AR 258-262. The fax cover sheet indicated 5 pages including cover sheet and each page of the report was labeled 'Page 1 of 4,' 'Page 2 of 4,' 'Page 3 of 4,' and 'Page 4 of 4.' AR 258-262. The December 28 Report was signed by William Andrews, a physician certified in Orthopedic Surgery, that discussed Zenadocchio's clinical history, a response to the question posed by Hartford in requesting the report, the video surveillance observations, a discussion with Dr. Wolfe, an assessment and supporting rationale, and a two-page list of documents received for

review. AR 259-262.  In regards to an opinion of Zenadocchio's work capacity as of May 7,

2011, the December 28 Report stated:

> In reviewing the objective data in this file, I do not find evidence of any rheumatic disease or syndrome that would be restricting or limiting.  The symptoms noted are those of chronic pain and diffuse tenderness but no data reports features [sic] in the work-up or examination information that objective [sic] support impairments. Therefore, unrestricted work would be her expected capabilities.

AR 253.

> The December 28 Report Assessment/Rationale stated:

> I have carried out a complete and thorough review of the medical record data provided in this file.  The historical information notes a history of diffuse pain with tenderness.  The work-up data in the file reveal normal findings including baseline chemistry, CBC, and a normal ESR with negative serological testing for rheumatic disease other than mild degenerative joint disease changes on her imaging data of the spine.  The exam findings in file note diffuse tenderness without features of any musculoskeletal findings that would be restricting or limiting.  Summarizing, from a rheumatology viewpoint, no data in this file would support restrictions or limitations on activities.

AR 254.

The next day, on December 29, 2011, RRS sent Hartford another fax, containing a

"corrected copy" of the Advisory Report. AR 251.  The December 29 Report was signed by

Dennis Payne, a physician certified in Rheumatology, but was otherwise identical to the

December 28 Report, except for in one respect. AR 251.255.  The fax cover sheet for the

December 29 Report again indicated 5 pages including cover sheet and the first three pages of

the report were labeled 'Page 1 of 4,' 'Page 2 of 4,' and 'Page 3 of 4.' AR 252-254.  However,

the fifth page of the fax (or, the fourth page of the report) was rotated and appears to be cut off

because it did not have 'Page 4 of 4' at the bottom as the other pages did. AR 255.  In effect, this

distinction alters the list of 'Documents Received for Review,' shortening the list down to only

five items, as opposed to the list in the December 28 Report, which included more than 30 items. AR 254-255, 261-262.

After receiving the report(s) from RRS in December of 2011, Joanne Wyzykowski, an Appeal Specialist from Hartford, stated in an email: "I have upheld the decision to terminate Ms. Zenadocchio's claim for LTD benefits." AR 248.  In a letter dated January 3, 2012, Wyzykowski wrote to Zenadocchio's counsel, informing him that an appeal review had been completed and determined that "Zenadocchio is not Disabled as defined in the Policy." AR 212-212-215. Hartford cited to the Policy language and all of the evidence in the claim file, viewed as a whole. AR 212-215.  Hartford explained that the claim file included the evidence listed in the May 9, 2011 initial termination letter as well as the evidence Zenadocchio submitted with her appeal. AR 212-215. As the basis of its decision, Hartford relied upon the findings of RRS, through Dr. Payne's review of the file, to uphold the decision to terminate Zenadocchio's claim for benefits effective May 7, 2011. AR 214.

Thereafter, Zenadocchio filed the claim that is now before the Court.

## II.  STANDARD OF REVIEW

A participant or beneficiary of an ERISA qualified plan may bring suit in federal court to recover benefits due under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). The standard of review for ERISA claims, such as this one, to recover benefits has oft been repeated by the Sixth Circuit.

### A.  Determining the Applicable Standard of Review

A challenge to the denial of ERISA benefits is ordinarily reviewed de novo. *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 504 (6th Cir. 2008) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). However, if the plan in question grants

discretionary authority to the administrator to determine benefit eligibility, the challenge to the benefits is reviewed under an arbitrary and capricious standard. *Id.* (citing *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 291-92 (6th Cir. 2005)). Because a denial of ERISA benefits is ordinarily reviewed de novo, the party claiming entitlement to review under an arbitrary and capricious standard has the burden of proving that the arbitrary and capricious standard applies. *Crider v. Highmark Life Ins. Co.*, 458 F. Supp.2d 487, 501 (W.D. Mich. 2006) (citing *Brooking v. Hartford Life and Acc. Ins. Co.*, 167 F. App'x 544, 547 (6th Cir. 2006)).

The Sixth Circuit does not require a plan to use any magic words such as "discretionary" to create discretionary authority for a plan administrator to determine benefits or interpret the plan. *Johnson v. Eaton Corp.*, 970 F.2d 1569, n.2 (6th Cir. 1992). Yet the Sixth Circuit has consistently required "a clear grant of discretion [to the administrator]" before replacing its duty to engage in de novo review with the arbitrary and capricious standard. *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994), cert. denied, 513 U.S. 1058 (1994).  In determining whether the administrator is given the requisite discretion under the Plan, the court must "focus on the Breadth of the administrators' power – their 'authority to determine eligibility for benefits or to construe the terms of the plan.'" *Perez v. Aetna Life Insurance Co.*, 150 F.3d at 555 (citing *Block v. Pitney Bowes, Inc.,* 952 F.2d 1450, 1453 (D.C. Cir. 1992), cert. denied, 531 U.S. 814 (2000)).

Zenadocchio argues that the Plan does not clearly provide Hartford with discretionary authority in making eligibility determinations, and therefore, asks this Court to apply a de novo standard of review. Doc. #16 at 10.  However, Zenadocchio's argument is unpersuasive in this regard.  The Plan states that "[t]he Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and

- 22 -

provisions of the Policy." AR 74.  Because the Plan grants Hartford discretionary authority to determine eligibility, this Court will apply the arbitrary and capricious standard of review to Zenadocchio's challenge.

## B.  Arbitrary and Capricious Review

An arbitrary and capricious review is "extremely" differential. *Smith*, 275 F. App'x at 504 (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003), *aff'd*, 128 S. Ct. 2343 (2008)). However, when undertaking a review under an arbitrary and capricious standard, an administrator's decision is not merely "rubber stamped." *Id.* A court is to review the quality and quantity of the medical evidence and the opinions of both sides. *Id.* (citing *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006)).

When it is possible to offer a reasoned explanation, based upon the evidence, for a particular outcome, that outcome is not arbitrary or capricious. *Rose v. Hartford Financial Services Group*, 268 F. App'x 444, 449 (6th Cir. 2008) (citing *Hunter v. Claiber Sys., Inc.*, 220 F.3d 702, 710 (6th Cir. 2000)). Said another way, if the decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence, the decision will be upheld." *Id.* (quoting *Elliott v. Metropolitan Life. Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006)).

On the other hand, indications of arbitrary and capricious decisions include a lack of substantial evidence, a mistake of law, bad faith and a conflict of interest by the decision-maker. *Caldwell v. Life Insurance Co. of North America*, 287 F.3d 1276, 1282 (10th Cir. 2002).  Also, a decision based upon a selective review of the record or an incomplete record is arbitrary and capricious. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir. 2005).  Finally, where the reports of two physicians who performed file reviews and the opinion of the plan administrator contain significant misstatements, misinterpretations and omissions of the relevant

medical evidence, the plan administrator's decision is not the product of a deliberate principled reasoning process. *Spina v. CVS Long Term Disability*, No. 1:10-CV-243, p. 16 (S.D. Ohio Mar. 2, 2011).

To avoid an arbitrary and capricious result, experts retained by the plan administrator must be given all of the pertinent medical records upon which to base their recommendations. *Spangler v. Lockheed Martin Energy Systems, Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) (insurer's action in sending only a physical capacities evaluation to the expert performing a transferable skills analysis was arbitrary and capricious); *Williams v. International Paper Co.*, 227 F.3d 706, 713 (6th Cir. 2000) (plan administrator acted arbitrarily and capriciously by not considering additional medical evidence submitted with an appeal). Also, a failure to perform an independent medical examination when a lack of data verifying the severity of any potential disabilities is used to support a decision to terminate benefits is arbitrary and capricious. *Pitts v. Prudential Insurance Co. of America*, 534 F. Supp.2d 779, 790 (S.D. Ohio 2008).

A final factor considered by the court in applying the arbitrary and capricious standard is the existence of a conflict of interest. *See e.g.*, *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008). For example, when the plan administrator is the insurer that ultimately pays the benefits, the plan administrator has a conflict of interest. *Gismondi v. United Technologies Corp.*, 408 F.3d 295, 299 (6th Cir. 2005) (citing *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998)).

The conflict of interest does not alter the standard of review, but is weighed as but one factor in determining whether there is an abuse of discretion. *Gismondi*, 408 F.3d at 298. The significance of a conflict of interest depends upon the circumstances found in the particular case. *Glenn*, 128 S. Ct. at 2345.

- 24 -

When weighing a conflict of interest, the court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision. *Carr v. Reliance Standard Life Insurance Co.*, 363 F.3d 604, n.2 (6th Cir. 2004); *Calvert*, 409 F.3d 286 at n.2. (6th Cir. 2005). For example, "a long history of biased claims administration may render the conflict more important, but where a claims administration has taken 'active steps to reduce potential bias and to promote accuracy,' the conflict 'should prove less important.'" *Id.* (citing *Glenn*, 128 S. Ct. at 2351). Finally, the plaintiff must show that a conflict of interest existed and that the conflict actually affected or motivated the decision at issue. *Cooper v. Life Insurance Co. of North America*, 486 F.3d 157, 165 (6th Cir. 2007).

In sum, the court will consider the cumulative effect of several factors when reviewing a plan administrator's decision. *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009).

## III.  ANALYSIS

The Court's decision rests solely upon whether Hartford's decision to terminate Zenadocchio's LTD benefits was supported by a reasonable explanation.  Hartford does not dispute that Zenadocchio suffers from fibromyalgia; however, this diagnosis is not dispositive of Zenadocchio's eligibility. Zenadocchio must be 'disabled' under the Plan from performing one or more of the 'Essential Duties' of her occupation as a financial analyst.  Based on the cumulative effect of the following factors, the Court concludes that Hartford's decision was *not* supported by a reasonable explanation and was therefore, arbitrary and capricious.

### A.  The Effect of Hartford's Conflict of Interest

The Court begins with the conflict of interest created by Hartford's role as both the insurer and the plan administrator.  Hartford does not dispute its "dual role" and while Hartford

is correct in stating a conflict of interest does not alter the standard of review, the Court considers this conflict as a contributing factor, the significance of which depends upon the circumstances found in the particular case. Here, Hartford's conduct in administering Zenadocchio's claim, which consisted of selective deference to opinions and medical evidence regarding Zenadocchio's eligibility, renders the conflict of interest significant. *See e.g.*, *Kalish v. Liberty Mutual/Liberty Life Assur. Co.*, 419 F.3d 501 (6th Cir. Mich. 2005) (A dual role administrator, "in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a clear incentive to contract with individuals who are inclined to find in its favor that a claimant is not entitled to continued disability benefits."). Though this factor in itself, does not render Hartford's decision arbitrary and capricious, the Court finds it of influence in light of the remaining factors.

### B. Hartford's Demand for Objective Evidence in Light of Plan Provisions

The Court begins with noting the tension accompanying a claim for benefits in the context of fibromyalgia, a disease associated with inherently subjective symptoms, and the demand for objective evidence in regards to this disease. The Sixth Circuit addressed this issue, stating that "[a] claimant could certainly find burdensome a requirement that she proffer objective evidence of fibromyalgia itself, the symptoms of which are largely subjective. But objective evidence of disability due to fibromyalgia can be furnished by a claimant without the same level of difficulty." *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008). Sixth Circuit precedent "suggests that it is entirely reasonable for an insurer to request objective evidence of a claimant's functional capacity." *Rose*, 268 F. App'x at 453-454 (unpublished) (collecting cases).

Notwithstanding this general rule, the scope of objective evidence is not without limits, specifically, when looking at the impact that provisions has on an administrator's ability to demand objective evidence as the sole means of proving disability.  In *Curry*, the Sixth Circuit discussed the effect of explicit plan provisions in analyzing "whether sufficient objective evidence exists to support a finding of 'disabled.'" *Curry v. Eaton Corp.*, 400 F. App'x 51, 61 (6th Cir. 2010).  Specifically, the plan in that case provided that "Objective findings of a disability are necessary to substantiate the period of time your physician indicates you are disabled. Objective findings are those that can be observed by your physician through objective means, not just from your description of the symptoms."  The Court noted:

> [T]here is no documentation of decreased range of motion, objective muscle weakness, signs of radiculopathy, sensory examination findings, joint deformity or effusion, or synovitis. Her gait is documented to be normal. There is no evidence of collagen vascular disease, rheumatoid arthritis, or other inflammatory arthritis in the claimant. There is no documentation of positive serologic markers of inflammation. . . .

*Id.*

To that extent, the Court recognizes that when the provisions of a plan explicitly require objective evidence and/or preclude the claimant's reliance on other types of evidence, such as physician opinion or self-reported symptoms, "a lack of objective medical evidence upon which to base a treating physician's opinion has been held sufficient reason for an administrator's choice not to credit that opinion."  *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 987 (6th Cir. 2010) (holding that decision not arbitrary when overall conclusion was consistent with plan summary, which provided that "[o]bjective medical evidence must be supplied supporting your case for disability. A letter from your treating physician merely stating that you are unable to work without any supporting information will not be considered as conclusive proof of your disability."); *see also Boone v. Liberty Life Assur. Co. of Boston*, 161 F.

App'x 469, 473 (6th Cir. 2005) (administrator's decision not to credit treating physicians' assessments not arbitrary because the assessments were not supported by the objective evidence, as required by the plan document).

This is distinguished from *Helfman*, wherein the Sixth Circuit addressed a claimant's report of the "highly subjective symptom" of stress. *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 395-396 (6th Cir. 2009).  In its analysis, the court noted that the provisions of the applicable plan "require the administrator to determine whether a particular employee is able to perform the material and substantial duties of his occupation" which "is by its very terms subjective." *Id.* at 395. Based on this, the court stated: "[t]he fact that stress is highly subjective does not, under the terms of the policy, render it irrelevant to a determination of disability." *Id.* Ultimately, "[b]ecause the terms of the policy do not preclude prophylactic factors from consideration when determining whether an employee can perform his occupation, the administrator's rejection as such is a factor weighing in favor of a finding that the decision was arbitrary and capricious." *Id.*

Here, Hartford's Plan defines 'disabled' as preventing the claimant "from performing one or more of the Essential Duties of Your Occupation."  Although the Court agrees with Hartford that "objective evidence of disability due to fibromyalgia can be furnished by a claimant without the same level of difficulty," the Plan does not contain provisions that demand objective evidence as the sole grounds for disability or preclude reliance on subjective evidence or physician opinion.  Thus, Hartford's request for objective evidence from Zenadocchio is not inherently problematic; however, Hartford cannot use this demand as grounds to give no probative value to other evidence. *See, e.g.*, *Lanier v. Metro. Life Ins. Co.*, 692 F. Supp. 2d 775, 788 (D. Mich. 2010) ("A formal functional capacity assessment . . . is not the only objective

proof of a claimant's limitations. A qualified physician can correlate clinical findings with the results of objective medical testing to render an opinion on the ability of an individual to perform certain tasks.").

This is particularly true when, as here, Hartford has not performed a formal functional capacity assessment and has no other 'objective' evidence upon which it relies to refute Zenadocchio's claimed level of functionality. *See, e.g.*, *Hunter v. Life Ins. Co.*, 437 F. App'x 372, 379 (6th Cir. 2011) (distinguishing from *Rose*, wherein "the claimant was surveilled as she conducted herself in a manner contrary to her claimed level of functionality"); *Elliott*, 473 F.3d at 618 ("[M]edical data, without reasoning, cannot produce a logical judgment about a claimant's work ability."); *Hanusik v. Hartford Life Ins. Co.*, 2008 U.S. Dist. LEXIS 7520, 15-18 ( E.D. Mich. Jan. 31, 2008) ("Although we continue to believe that plans generally are not obligated to order additional medical tests, in cases such as this, plans can assist themselves, claimants, and the courts by helping to produce evidence sufficient to support reasoned, principled benefits determinations.").

### C.  Hartford's Decision Not to Rely Upon the Opinion of Dr. Wolfe

Hartford argues that it reasonably declined to defer to Dr. Wolfe's opinion because "Dr. Wolfe identified restrictions and limitations that were consistent with Zenadocchio's job duties and provided no objective medical evidence to support his opinion of physical disability, even though Hartford asked him to do so."

Hartford correctly states that the "treating physician" rule does not apply in the ERISA context; however, plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of the treating physician[,] . . . nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts

with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829, 832-33, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003); *see also Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) ("a plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician"); *Curry*, 400 F. App'x 51, 2010 WL 3736277, *8 (6th Cir. 2010) ("Giving greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that a plan administrator's decision is arbitrary and capricious"); *Combs v. Reliance Std. Life Ins. Co.*, 2012 U.S. Dist. LEXIS 59292, 27-29 (S.D. Ohio Apr. 12, 2012), *aff'd*, 2013 U.S. App. LEXIS 819, 7-8 (6th Cir. 2013).

In determining whether a plan administrator has arbitrarily disregarded the opinion of a treating physician, the court in *Combs* listed a number of examples of an arbitrary disregard:

> One situation is where the evidence from the treating physicians is strong and the opposing evidence is equivocal, at best, and also lacking in evidentiary support. *See McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Another is where the contrary opinion of the non-treating physician was not based on an examination of the claimant and was supported only by a selective, rather than a fair, reading of the medical records. *See Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). Arbitrary decisions may also include ones which accept a file reviewer's disregard of subjective reports of symptoms based solely on a review of medical records which do not contain objective support for the claimant's complaints, *see Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005), and ones relying on an expert opinion that does not address crucial aspects of the claimant's former job and which is in conflict with other credible evidence in the record, including the opinion of the treating source. *See Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005).

*Combs*, 2012 U.S. Dist. LEXIS 59292, 27-29 (S.D. Ohio Apr. 12, 2012), *aff'd*, 2013 U.S. App. LEXIS 819, 7-8 (6th Cir. 2013).

Hartford argues its decision was reasonable, describing Dr. Wolfe's evaluation as an "unsupported opinion of physical disability." Specifically, Hartford argues that Dr. Wolfe identified restrictions that were consistent with Zenadocchio's job duties in the completion of the

'Physical Capacities Evaluation Form,' in March 2011 wherein Dr. Wolfe checked a series of boxes regarding Zenadocchio's current *physical* functionality, but opined that Zenadocchio was not capable of working.  This form asked for Dr. Wolfe's opinion on (1) Zenadocchio's physical capabilities and (2) her ability to work at a sedentary level full time.  The form did not ask for an evaluation or explanation of Zenadocchio's mental functionality either separate from or in conjunction with her physical functionality.  The Court also notes that at the time Dr. Wolfe completed this first form, he had only been seeing Zenadocchio for approximately two months.

The second Questionnaire, completed in September of 2011, requested Dr. Wolfe's opinion as to Zenadocchio's functionality in regards to both the physical and mental demands of her position, a combination of which Dr. Wolfe opined that Zenadocchio was unable to work.  Hartford disregarded that Dr. Wolfe, on both forms, expressed an opinion on the combined effect of Zenadocchio's physical and mental functionality to perform the essential duties of her job, even though the latter form was the only form that asked Dr. Wolfe to expand on both aspects of Zenadocchio's condition.

To justify its decision in regards to Dr. Wolfe's opinion, Hartford cites to the lack of objective medical evidence.  However, as previously discussed, the Plan provisions do not render Dr. Wolfe's assessment irrelevant to Hartford's decision.  Even more, Hartford received all medical records from Dr. Wolfe and Zenadocchio's other treating physicians which provide a significant amount of medical evidence of Zenadocchio's conditions to support Dr. Wolfe's opinion, including, for example, repeated findings of fibromyalgia tender points and numerous attempts at a variety of medications and other treatment options without success relating to Zenadocchio's consistent reports of pain, fatigue, muscle spasms, and difficulty with sleep.  Dr. Wolfe, while certainly not exemplary in communicating with Hartford, consistently disagreed

with any conclusion that Zenadocchio was able to perform the essential duties of her occupation as a Financial Analyst.

Based on this medical evidence, the Court does not see Hartford's decision-making process as reasoned when it opted to disregard Dr. Wolfe's assessment, deeming it an "unsupported opinion of physical disability." Hartford's decision-making in this regard similarly contributes to the Court's determination.

### D.  Hartford's Reliance on File Reviews

The Sixth Circuit recognizes that "reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly." *Calvert*, 409 F.3d at 295. Moreover, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Id.* at 296.  Notwithstanding, the decision to conduct file reviews, rather than a physical examination, is a factor properly considered in determining whether Hartford's decision was arbitrary and capricious. *Rose*, 268 F. App'x at 450; *see also Hunter*, 437 F. App'x at 378 ("The failure to perform a physical examination is 'one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician.'") (citations omitted).

#### 1.  *Reliance on the First Peer Review Report: Making Credibility Determinations in the Context of Self-Reported Symptoms*

Notwithstanding the general acceptance of file reviews, particularly when completed by an independent vendor, "the lack of a physical examination is particularly troublesome where, as here, the file reviewers make critical credibility determinations." *Hunter*, 437 F. App'x at 378; *see also Calvert*, 409 F.3d at 297 n.6 ("[T]here is nothing inherently improper with relying on a file review . . . . Where, as here, however, the conclusions from that review include critical

credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate.").

In the context of a claimant with self-reported symptoms, the plan administrator must follow a reasonable procedure in deciding the issue. *Combs v. Reliance Std. Life Ins. Co.*, 2012 U.S. Dist. LEXIS 59292, 27-29 (S.D. Ohio Apr. 12, 2012), *aff'd*, 2013 U.S. App. LEXIS 819, 7-8 (6th Cir. 2013). Specifically, the court in *Combs* stated:

> Especially when an issue exists as to the credibility of a claimant's subjectively-reported symptoms, the plan must follow reasonable procedures in deciding that issue. So, for example, "credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary." *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 395-96 (6th Cir. 2009); *see also Calvert v. Firstar Fin., Inc.*, 409 F.3d at 296-97 (conclusion that a claimant had subjectively exaggerated her symptoms was "incredible on [its] face" when physician reaching that conclusion never examined the claimant). This is particularly true when there is, in fact, objective medical evidence of the underlying condition which forms part of the basis of an opinion that a claimant is disabled due to pain, and the plan administrator performs a selective, rather than comprehensive, review of the records in reaching the opposite conclusion. *See, e.g., Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 739-40 (S.D. Ohio 2010) (where the record contained evidence of physical conditions which could reasonably cause pain, it was a "complete misreading of the medical records ... to say that Plaintiff's complaints of pain or weakness ... are subjective and unverifiable").

*Id.*

In holding the plan administrator's decision was *not* arbitrary and capricious, the court stated:

> Reliance did not limit its credibility determination to a review of the medical records alone. Reliance also scheduled a physical examination. *See Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 395-96 (6th Cir. 2009) (the administrator made an arbitrary determination about the plaintiff's pain complaints because it did so "without the benefit of a physical examination" to support the conclusion). In addition, Reliance reviewed two functional-capacity evaluations and asked physicians to assess Combs's functional capacity as well. The reviewing physicians considered Combs's accounts of her subjective pain, but they ultimately discounted these accounts and provided reasons for doing so. Specifically, Reliance relied on Dr. Richardson's conclusion that Combs's reported pain was inconsistent with the observations and physical findings she made during a physical examination.

*Id.*

In support of its decision to demand objective evidence and rely upon the Peer Review Report issued by Dr. Marwah, Hartford offers the case of *Rose v. Hartford Fin. Servs. Group*. However, *Rose* is readily distinguishable from case at hand.

In *Rose*, the insurer chose to rely on the opinion of a peer reviewer which was based upon the claimant's medical records, an in-person interview conducted by the insurer, surveillance footage which demonstrated the claimant's abilities in "traveling, walking, lifting, and carrying," and a questionnaire completed by the claimant. *Rose*, 268 F. App'x at 450. Moreover, the treating physician who opined on the claimant's functionality had only treated the claimant for a short time, beginning only after her benefits were terminated. *Id.* at 450-451. The court rejected the claimant's arguments, stating that "Rose produced very little such evidence; she offered merely the letters of her neighbors attesting to her need for assistance with home upkeep and other tasks, the conclusory statement of her newly retained doctor, and her own statement regarding her condition." *Id.* at 452.

On the contrary, Hartford never interviewed nor had surveillance footage of Zenadocchio (despite Hartford's efforts to attain such footage) to support its decision to rely on the opinion of Dr. Marwah. Despite undisputed objective evidence of Zenadocchio's underlying condition, Hartford made the credibility determination as to Zenadocchio's claimed disability without the benefit of evidence that refuted Zenadocchio's statement that she was unable to work and without taking reasonable measures to decide the issue, such as conducting an in-person examination. In terminating Zenadocchio's benefits, Hartford rejected Zenadocchio's self-reported symptoms and claimed inconsistencies because of Dr. Wolfe's remark which stated, in the words of Hartford, restrictions that included "*possible* sedentary to light function."

The Court is not claiming Hartford was under a responsibility to perform an in-person examination, however, the Court does find that Hartford did not engage in reasonable procedures in deciding the extent to which Zenadocchio's fibromyalgia and other medical conditions either physically or mentally impacted her ability to perform her duties as a financial analyst. *See, e.g.*, *Pitts v. Prudential Insurance Co. of America*, 534 F. Supp.2d 779, 790 (S.D. Ohio 2008) (failure to perform an independent medical examination when a lack of data verifying the severity of any potential disabilities is used to support a decision to terminate benefits is arbitrary and capricious.). This becomes a persuasive factor to the Court's decision, when, as here, "there is, in fact, objective medical evidence of the underlying condition which forms part of the basis of an opinion that a claimant is disabled due to pain . . ." *Combs v. Reliance Std. Life Ins. Co.*, 2012 U.S. Dist. LEXIS 59292, 27-29 (S.D. Ohio Apr. 12, 2012), *aff'd*, 2013 U.S. App. LEXIS 819, 7-8 (6th Cir. 2013).  Hartford's decision in regard to Zenadocchio's "self-reported symptoms" does not reflect deliberative, principled reasoning, but instead weighs towards the Court's conclusion that Hartford's decision to terminate was arbitrary and capricious.

### 2.  *Reliance on the Second Peer Review Report: Quality of the Review*

In resolving a conflict between the opinion of a treating physician and the opinions of file reviewers, a plan administrator must "provide reasons — including a lack of objective evidence - for adopting the alternative opinions that are consistent with its responsibility to provide a full and fair review" of the claimant's claim for benefits. *Curry*, 400 F. App'x at 60; *see also Cooper*, 486 F.3d at 170 (noting that "conclusory and unsupported statements that the documentation of [the claimant's] functional capacity was insufficient to support a finding of disability" is not enough to support the denial of LTD benefits).  Moreover, "'[t]he mere possibility' of a particular conclusion, notwithstanding 'overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's decision to deny' a claim." *Metro. Life Ins.*

*Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 170-171 (6th Cir. 2003)).

Turning to the Peer Review Report from RRS, the Court will first address the dispute regarding the authenticity and/or authorship of report sent by RRS.  While the circumstances remain unexplained to a certainty, the more plausible explanation is the one urged by Hartford. Accepting Dr. Payne as the author of the report and accepting that Dr. Payne reviewed the full list of medical evidence, the Court still finds trouble in Hartford's reliance on Dr. Payne's report. Specifically, Hartford's failure to notice the truncated list of medical records, a problem which could have been easily fixed, as evidence of Hartford's less-than reasoned approach to Zenadocchio's claim.  Instead of clarifying the mistake list and seeking a corrected version from RRS, Hartford opted to rely on the conclusion without hesitation.

In addition, the Court identifies some substance insufficiencies in Dr. Payne's report. Particularly, in his opinion of Zenadocchio's ability work, Dr. Payne stated: "I do not find evidence of any rheumatic disease or syndrome that would be restricting or limiting.  The symptoms noted are those of chronic pain and diffuse tenderness but *no data reports features in the work-up or examination information that objective support impairments*." (emphasis added). However, Zenadocchio had a substantial amount of objective evidence that would support impairment, including, for example, consistent fibromyalgia tender points when examined. *Cooper*, 486 F.3d at 170 ("conclusory and unsupported statements that the documentation of [the claimant's] functional capacity was insufficient to support a finding of disability" is not enough to support the denial of LTD benefits).

In sum, Hartford's decision to rely upon the opinions of the file reviews reflects an attempt by Hartford to justify its decision to terminate Zenadocchio's benefits, that while in itself

may not have been dispositive, is yet another factor the Court attributes to its finding that Hartford's decision was not supported by deliberative, principled reasoning.

### E.  Hartford's Consideration of the Essential Duties of Zenadocchio's Position

Finally, Hartford did not properly consider the entire scope of Zenadocchio's essential duties of her position in accordance with her limitations.  In making its initial termination of benefits, relying on the report of Dr. Marwah, the only mention of Zenadocchio's mental ability is Dr. Marwah's statement that "[t]he records do not indicate any problems with cognition, concentration, judgment, memory, or insight."  Hartford's denial letter to Zenadocchio listed a job description as part of the reviewed documents, but made no reference or explanation of any analysis that demonstrates Hartford's reasoned process in deciding Zenadocchio did not offer evidence that she was not able to perform the essential duties of her position as required by the plan.  *See, e.g.*, *Hunter*, 437 F. App'x At 377 ("[M]ere mention of Hunter's job description, without analysis, is insufficient to demonstrate that these physicians actually considered Hunter's ability to perform the physical demands of her prior occupation.); *Elliott*, 473 F.3d at 619; *McDonald*, 347 F.3d at 172.

In upholding its decision to terminate Zenadocchio's benefits, Hartford relies heavily on the evaluation conducted by Dr. Kramer in November of 2010.  Dr. Kramer's evaluation does not establish that Zenadocchio is without mental limitations on her ability to perform her job as the report cites a number of mental limitations while concluding that "the claimant has the mental ability to perform simple and repetitive tasks."  At the very minimum, Dr. Kramer's report should have prompted Hartford to take a closer look to determine the extent of Zenadocchio's mental limitations, which Hartford did not do.  Hartford also relies on Dr. O'Connell's statements in October 2010 to January 2011, which stated "[n]ormal concentration and attention span noted" and "[e]stimate of mood and affect show no evidence of depression,

excessive anxiety, or agitation."  However, in these same records, Dr. O'Connell also noted that Zenadocchio has shown no improvement from previous treatment of "chiropractic manipulation, physical therapy modalities, steroid injections, pain medications, over the counter medications, and NSAID."

Interestingly, while Hartford invokes the November 2010 evaluation of Dr. Kramer and the October 2010 through January 2011 opinions (though seemingly only opinions relating to mental limitations) by Dr. O'Connell, Hartford also urges the Court that the surveillance (or lack thereof) "would not be relevant" because "Zenadocchio's alleged lack of activity in October 2010 . . . *is not probative of her functional ability six months later in May 2011*." Doc. #19 at 10 (emphasis added).  The Court refrains from opining as to the probative value of each, but Hartford's contradictory statements as to what is and what is not probative certainly does not represent a deliberative reasoned decision-making process. *See, e.g.*, *Curry*, 400 F. App'x at 67 ("An administrator acts arbitrarily and capriciously when it engages in a selective review of the administrative record to justify a decision to terminate coverage.") (citations and internal quotations omitted); *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265-266 (6th Cir. 2007) ("MetLife supported its decision to rescind only by its cherry-picking symptoms from Conger's medical records, and then reverse-engineering a diagnosis. This is not the hallmark of a reasoned explanation."); *Moon*, 405 F.3d at 381 (requiring a reasoned explanation "consistent with the quantity and quality of the medical evidence") (internal quotation omitted).

## IV.    REMEDY

Upon determining that Hartford's decision to terminate Zenadocchio's benefits was arbitrary and capricious, the Court turns to the proper remedy: "courts may either award benefits

to the claimant or remand to the plan administrator." *Elliott*, 473 F.3d at 621.  In this case, the Court finds that remand to Hartford is the suitable remedy.

Remand is the appropriate remedy "where the problem is with the integrity of [the plan's] decision-making process, rather than that [a claimant] was denied benefits to which he was clearly entitled, the appropriate remedy generally is remand to the plan administrator." *Id.* at 622 (internal quotation marks and citation omitted); *see also Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 265 (6th Cir. 2006) ("[W]e vacate the judgment of the district court and remand this case for entry of an order requiring CCC to conduct a full and fair review of Smith's disability claim.").

On the other hand, a retroactive reinstatement of benefits is appropriate only when "is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Daft v. Advest, Inc.*, 658 F.3d 583, 595 (6th Cir. 2011) (quoting *Tate v. Long Term Disability Plan for Salaried Emps. Of Champion Int'l Corp. No. 506*, 545 F.3d 555, 563 (7th Cir. 2008) (internal quotation marks omitted), abrogated on other grounds by *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 176 L. Ed. 2d 998 (2010)). *See also Kalish*, 419 F.3d at 513 (concluding that where claimant has clearly established that he or she is disabled, the appropriate remedy is an immediate award of benefits rather than a remand to allow the plan administrator to consider evidence that it previously ignored).

Here, the culmination of several factors, none of which alone is necessarily dispositive, the Court finds Hartford's termination of Zenadocchio's claim for benefits was arbitrary and capricious because it was not the result of a deliberative, principled reasoning process.  However, the record does not show Zenadocchio is clearly entitled to benefits.  While Zenadocchio's medical history indicates a number of recurring limitations, Hartford's decision-making process should address "[j]ust how much such limitations would affect her ability to work" in

comparison to the physical *and* cognitive essential duties of Zenadocchio's position. *Elliott*, 473 F.3d at 622; *see also Hunter v. Life Ins. Co.*, 437 F. App'x 372, 380 (6th Cir. 2011).

Accordingly, the Court remands this matter to Hartford to conduct a full and fair review as "[s]uch a remedy will allow for a proper determination of whether, in the first instance, [Zenadocchio] is entitled to [continued] long-term disability benefits." *Elliott*, 473 F.3d at 622; *see also Helfman*, 573 F.3d at 392-96 (remand appropriate where court is unable to say with certainty that claimant is clearly entitled to benefits).  Hartford shall permit Zenadocchio to supplement her file with written comments, documents, records, and other information relating to her claim, all of which Hartford shall take into account in making its decision.

## V.    CONCLUSION

For the reasons set forth above, Plaintiff Zenadocchio's Motion for Judgment On the Administrative Record (Doc. #16) is **GRANTED** in part, and Defendant BAE Systems and Hartford's Motion for Judgment On the Administrative Record (Doc. #12) is **OVERRULED**. This case is **REMANDED** to Hartford with instructions to conduct a "full and fair review" of Zenadocchio's claim for benefits consistent with this opinion.  The captioned cause is hereby ordered **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.  Further, it is ordered that **Hartford shall make a decision thereon within 90 days of the entry of this Order.**

**DONE** and **ORDERED** in Dayton, Ohio, March, 29, 2013.[1]

**s/Thomas M. Rose**

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

---

[1]The Court acknowledges the valuable contribution and assistance of judicial extern Jenna S. Harrison in drafting this opinion.